[Civ. No. 26202. Second Dist., Div. Three. Feb. 8, 1963.]

Estate of FREDERICK M. BISSINGER, Deceased. BARBARA BISSINGER GRANT, Objector and Appellant, v. SECURITY FIRST NATIONAL BANK, Petitioner and Respondent.

Stanley N. Gleis and John G. Grant for Objector and Appellant.

Lawler, Felix & Hall and John G. Wigmore for Petitioner and Respondent.

SHINN, P. J.—The appeal before us was taken by Barbara Bissinger Grant from an order overruling her objections to the seventh account of Security First National Bank (successor to Farmers and Merchants National Bank) as trustee under the will of Frederick M. Bissinger, and approving and settling said account. The ground of appellant's objections, and the contention on appeal, is that the trustee failed in the performance of its duties in that in selling certain shares of common stock and purchasing certain tax-free bonds it failed to exercise the judgment and care under the circumstances then prevailing which men of prudence, discretion, and intelligence exercise in the management of their own affairs (Civ. Code, § 2261, subd. (1) but was unduly influenced by and unfairly acceded to the demands of John W. Bissinger, then the life beneficiary of the trust income, to the disadvantage of appellant, who is presumptively remainder beneficiary under the will of Frederick.

After an extended trial, the court found that in making the sales and reinvesting the proceeds the bank as said

trustee "acted reasonably, prudently, in good faith and in the exercise of its best judgment . . . and with the intention of being fair to both the income and remainder beneficiaries; that the exercise made by the Bank as said Trustee of its powers and discretions was reasonable and fair to both the income and remainder beneficiaries of said trust."

There is no disagreement as to the duties of trustees imposed by law as the same are expressed in section 2261 subdivision (1) of the Civil Code which is set out in the footnote.[1] Also pertinent is comment (b) section 232 of the Restatement Second of the Law of Trusts.[2]

No contention is made that the trustee exceeded the powers that were conferred upon it; by the decree of distribution it had power and discretion to manage, control, sell, convey, and exchange the trust estate, to invest and reinvest, to determine what is principal or income of the trust estate and apportion and allocate receipts and expenses as between these

---

[1] "In investing, reinvesting, purchasing, acquiring, exchanging, selling and managing property for the benefit of another, a trustee shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of their capital. Within the limitations of the foregoing standard, and subject to any express provisions or limitations contained in any particular trust instrument, a trustee is authorized to acquire every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, which men of prudence, discretion and intelligence acquire for their own account."

[2] "b. Duty to each of successive beneficiaries. If by the terms of a trust the trustee is directed to pay the income to a beneficiary during a designated period and on the expiration of the period to pay the principal to another beneficiary, the trustee is under a duty to the former beneficiary to take care not merely to preserve the trust property but to make it productive so that a reasonable income will be available for him, and he is under a duty to the latter beneficiary to take care to preserve the trust property for him.

"Although the trustee is not under a duty to the beneficiary entitled to the income to endanger the safety of the principal in order to produce a large income, he is under a duty to him not to sacrifice income for the purpose of increasing the value of the principal. Thus, the trustee is under a duty to a life beneficiary not to purchase or retain unproductive property or property which yields an income substantially lower than that which is normally earned by trust investments, although it is probable that the property will appreciate in value.

"On the other hand, the trustee is under a duty to the beneficiary who is ultimately entitled to the principal not to purchase or retain property which is certain or likely to depreciate in value, although the property yields a large income, unless he makes adequate provision for amortizing the depreciation."

accounts and generally to exercise all the rights, powers, and privileges which an absolute owner of the property would have.

In the absence of probative findings (and there were none) which would overcome the facts thus found, those we have quoted furnish support for the order which the court made. The sole contention on the appeal is that there was insufficient evidence to support these findings, and that it was established as a matter of law that the trustee was guilty of negligence in the performance of its duties. The record does not sustain this contention.

Frederick M. Bissinger died June 27, 1953. His will was admitted to probate July 27, 1953, and the estate was eventually distributed to Edgar S. Bissinger and the bank (then Farmers and Merchants National Bank) as trustees. Under the terms of the will which were incorporated in the decree of distribution, Emma L. Bissinger, mother of decedent, received the net income from the trust estate until her death January 11, 1959. The corpus of the trust could have been invaded for her support, care, and comfort but this was found to be unnecessary. At the time of the death of Emma, one-half of the trust estate was distributed to decedent's brother, Edgar S. Bissinger, and another brother, John, became entitled to the income during his lifetime from the half that remained in the trust. On the death of John the trust estate is to be divided in equal shares, one share to each living child of John and one share to the then living issue of any deceased child of John, subject to certain limitations as to when the issue shall respectively attain certain ages.

At the time of the death of Emma in 1959, the trust assets, consisting of common stocks with a negligible amount of preferred stocks and no bonds, were valued at about $800,000, with a gross annual income of approximately $10,000 or 1.3 per cent of their market value. On May 12, 1960, the bank sold 425 shares out of 838 shares of International Business Machines stock and 300 shares out of 800 shares of Minnesota Mining & Manufacturing stock for a total sum of about $230,-000; capital gains taxes were paid in the amount of $64,849.12 and the remaining proceeds of about $173,000 were invested in tax-free bonds. At the time appellant filed her objections on October 1961 the stocks that had been sold had a market value of about $450,000.

Both appellant and John filed objections to the trustee's seventh account. Appellant sought an order of court requir-

ing the bank to sell the bonds and to repurchase the stocks that had been sold with the proceeds from the sale of the bonds and necessary additional money, to be furnished by the trustee. By his objections John sought an order requiring the bank to divest itself of the IBM, MM & M, and Dow Chemical stocks and to reinvest the proceeds so as to produce an adequate income for the life beneficiary. At that time the cash dividends of IBM amounted to 1.6 per cent of market value, those of MM & M to 1 per cent of market value. The net annual income from the trust payable to John was about $8,000 and this was increased by income from the bonds purchased to about $12,000.

The arguments of appellant are only those that were unsuccessfully urged to the trial court. Although they are presented under different headings they are but variations of the contention that the trustee did not exercise informed, considered, and independent judgment. Two witnesses testified on behalf of the trustee as experts in trust management. These were Frank H. Schmidt, who was the senior vice president of the United California Bank in charge of its trust department, and Paul A. Pflueger, Jr., financial vice president of Title Insurance and Trust Company, and for nine years a member of the trust investment committee. In answer to a hypothetical question these witnesses expressed the opinion that the action taken by the trustee was reasonable and prudent.

Appellant first assails the opinions expressed by these witnesses as having been based upon inaccurate and incomplete facts and having little or no value as evidence. The witnesses were asked to assume facts which were stated in a letter from the trustee's representative to Edgar, the cotrustee, with which letter the witnesses were familiar; to assume that the transactions in the stocks and bonds were made, as they were in fact made, and to express their opinion whether the trustee had acted reasonably and prudently. Objection was made to the question upon the ground that the letter "doesn't tell the whole story" and that the answer would be based upon inaccurate facts. The objection was overruled and the witnesses expressed their opinions that the trustee had acted reasonably and prudently.

Since it is presently argued that the opinions expressed by these witnesses were insubstantial, reference will be made to the mentioned letter. December 11, 1959, a few months after the distribution of one-half of the trust assets to Edgar

a letter was written to him by Mr. Mullens, vice president and manager of the trust department, in which he outlined to Edgar, as cotrustee, the situation which had come into being upon the death of Emma and partial distribution of the trust estate. It was a comprehensive review of the terms of the will; it explained that there was disagreement between the income beneficiary, John, and Mrs. Grant with respect to their respective rights; it set forth the facts with respect to the total income, the rate of yield and the rate of yield of IBM and MM & M stocks owned by the trust; it stated that John wished all the IBM, Dow Chemical, and MM & M stocks to be sold and the proceeds invested in common stocks yielding $2\frac{1}{2}$ per cent, while Mrs. Grant wished the stocks to be retained in the trust. The letter outlined the program which was later carried out, and expressed the opinion that it would be a fair adjustment of the extreme positions of the beneficiaries, although satisfactory to neither.

When the hypothetical question was first proposed and was objected to upon the grounds above stated, counsel did not mention any particular in which the facts stated in the letter were inaccurate or incomplete, but rested upon the general objection, which the court overruled. Thereafter, the witnesses stated at length their reasons for their opinions that the action taken by the trustee was fair to both the income and remaindermen beneficiaries.

It is not contended that the court committed error in the receipt of this opinion evidence but the brief of appellant specifies eight particulars in which it is claimed the hypothetical question was deficient. Briefly, they are the following: The trustor had long favored the retention of common stocks for investment purposes. The life tenant, John, first suggested liquidation of the same investments; the trustee's investment committee knew that the demands of John were more moderate than those expressed in the letter; the attorneys for the trust were not consulted about the December 11th letter; Edgar was opposed to the investment program suggested in the letter and thought it would be desirable to petition the court for instructions; the trustee should have understood that it was the trustor's desire to retain the assets in the trust and "to dispense with the requirement of diversification"; the trustee should have considered whether there were assets in the trust that could have been allocated to the income account without the liquidation of assets.

It may well be that upon proper objection and request some

of the matters now particularized would have been added to the hypothetical question, but we cannot see any deficiency in question that was propounded. All the facts which were material to an understanding of the situation that confronted the trustee were contained in the hypothetical question. Mr. Schmidt was cross-examined at great length by two of appellant's attorneys and by an attorney for John W. Bissinger. Every phase of the condition of the trust, the claims of the beneficiaries, the duties of the trustee to act impartially with respect to the interested parties and the considerations that should have influenced the actions of the trustee were explored in great detail. Mr. Pflueger was cross-examined in much the same manner. The opinions that were expressed by the expert witnesses were strongly fortified by the reasons upon which they were based, as they were elicited in the direct and cross-examination. It is not contended that the opinions were incompetent, as based upon insufficient or erroneous facts, but only that they were of little value as evidence. With this we must disagree.

One witness, Edgar S. Bissinger, gave opinion testimony on behalf of appellant. He qualified as a student in the investment field, in general, over a period of many years and as a nonprofessional investment counselor for friends. He expressed the opinion that he did not think the plan of the trustees as outlined in the letter which he received was a prudent one; he made no written response to the letter because he determined to and did resign as cotrustee.

Another expert witness was Neil Campbell, who was called in behalf of John W. Bissinger. He had been in the security investment business since 1946. He was asked his opinion whether the program outlined in the Mullens letter was a prudent one and he replied that in his opinion ''the account was not handled properly in 1960.'' He thought the diversification of the account was extremely out of balance and highly speculative, principally because of the IBM and MM & M stocks, which he considered speculative, notwithstanding that ''they carry top quality rating.'' He thought the trust should have been managed to bring a return in the neighborhood of 4 per cent.

It is clear that the court was impressed by the testimony of the witnesses Schmidt and Pflueger, rather than the opinion expressed by Edgar Bissinger. Also the conclusion of the court that the trustee acted reasonably in retaining 50 per cent of the IBM and about 60 per cent of the MM & M stock

shows the court's lack of reliance upon the opinion expressed by Mr. Campbell.

Taylor F. Mullens, who was vice president and manager of the trust department at the time he composed the letter to Edgar Bissinger, testified at length as to the matters which influenced the trustee to adopt a new program for the trust after the death of Emma Bissinger. He stated the reasons for his belief that the program would afford protection to the remaindermen and at the same time produce a fair income for the income beneficiary.

Gerald F. Willmont, vice president and manager of the trust department at the time in question, explained his reasons for believing that the change in the investment portfolio was reasonable and prudent; it was "outside of the bounds of good investment practice" to maintain the trust entirely in common stocks; without the power to invade the corpus it was necessary to seek more reasonable income for the life tenant; the matter of the proper investment of the funds after the income became payable to the life beneficiary was discussed with the head of the bank's investment department and with the trust administrator; they believed that the IBM and MM & M stocks represented a sound investment, but it was the policy of the bank to keep in trusts some stocks that would pay a regular rate on the investment without substantial fluctuations of price. The proposed program was thoroughly considered and the decision was not materially influenced by the demands of John Bissinger.

It is contended that the trustee failed to exercise independent judgment, but allowed itself to be unduly influenced by the insistence of John Bissinger that low income stocks be replaced with those producing higher income. The evidence did not support the claim that the trustee failed in its duty to act in accordance with its best judgment. The wishes of the income beneficiary were deserving of consideration. The trustee was not the master, at liberty to ignore the wishes of the beneficiaries, but a servant, albeit with broad authority and power over the trust. If John Bissinger had been satisfied with the income he was receiving and the other beneficiaries who were qualified to speak had wished to retain the investments as they were, the conversion of the common stocks into bonds in opposition to the wishes of both beneficiaries would have created an entirely different problem. But the trustee could not ignore the reasonable demands of John Bissinger without subjecting itself to the criticism that

it was unfairly favoring the remaindermen. No course of action could have satisfied both the income beneficiary and the remaindermen. John Bissinger was urging not only the sale of the IBM and MM & M stocks but also the sale of the Dow Chemical stock which was valued at about $80,000. The demands of Mrs. Grant went to the other extreme. Edgar Bissinger, the cotrustee, had an opportunity to propose a program that would be more fair to both beneficiaries than the one proposed by the trustee, but he declined to accept any responsibility; and since the beneficiaries could not agree upon a plan, the remaining trustee was forced to devise one of its own. Retention of half of the IBM stock and 60 per cent of the MM & M stock was the exercise of conservative judgment. Neither John Bissinger nor Mrs. Grant advocated a course that would not have ignored the claims of the other. The evidence fully supported the implied finding that the trustee acted in the exercise of its own independent judgment.

Another contention of appellant is that there was manifest in the investment policy which Frederick had pursued, and in the terms of his will, an implied direction that the trustee should continue with the same investment policy, that is to say, that the assets should consist only of common stocks. Assuming the existence of an implied direction to the trustee that bonds be excluded from the portfolio, it is contended that the trustee violated its duty in ignoring the desires of the trustor.

Appellant offered in evidence a memorandum prepared in 1952 by Victor Rosetti, when he was chairman of the board of the bank, relating an interview he had had with Frederick Bissinger at that time which read in part: "Incidentally, he mentioned that he has named this bank as his Executor and Trustee, and estimates the value of his estate at approximately $800,000 at this time, all of it in common stock, stating that he was not interested in bonds. I told him I very much appreciated his kind consideration of our facilities." An objection to the offer was sustained. It is contended the memorandum disclosed that Frederick had a preference for common stocks rather than bonds and that it was his wish and expectation, known to the trustee, that it would continue the same investment policy.

The objection was properly sustained. There was no ambiguity in the decree of distribution respecting the authority

of the trustee, nor any direction or request with respect to investments. Nothing of the sort could be added to limit that authority by means of evidence of the investment policies of the testator. (*Estate of Genung,* 161 Cal.App.2d 507 [326 P.2d 861]; *Estate of Buckhartz,* 159 Cal.App.2d 635 [324 P.2d 317].)  ▮ Mr. Bissinger's investment policy was disclosed by the fact that he owned common stocks and no bonds at the time of his death. No inference could have been drawn from that fact, or the memorandum, that he would have expected the trustee to follow the same investment policy. It indicated nothing more than that Mr. Bissinger was more interested in increasing the value of his estate than he was in the income that it might return. But under the terms of his will the income became of more importance, since it directed that Emma Bissinger should not only receive the income but that it could be supplemented by resort to the principal of the trust if necessary for her care, support, and comfort. The failure to provide that the corpus might be invaded for the support of John was the indirect cause of the unanticipated controversy that arose later when John decided that the income would be insufficient for his needs. When this developed the problem necessitated exercise of the judgment and discretion of the trustee. Until that event the assets were maintained almost exclusively in common stocks. The contention that the trustee ignored or cast aside the policies of the trustor is unfounded.

The substance of appellant's entire argument is summed up in the statement: "Judicial notice can be taken that professional corporate fiduciaries have long held themselves out to the public as 'experts' *both* in matters of trust management *and* investment judgment. Should any such institution fail to meet these self-set standards in a manner fully consistent with its fiduciary obligations the courts should intervene." ▮ However this may be, acceptance of a trusteeship is not an acceptance of responsibility for every mistake of judgment. One who engages services of a trustee, corporate or otherwise, contracts for the exercise of the trustee's best judgment and for the performance of the duties outlined in section 2261 subdivision (1) of the Civil Code. He has no right to receive any more than this and no right to complain if those services are rendered in good faith and with reasonable prudence, discretion, and intelligence.

▮ The findings that the trustee fully performed its

duties in the respects in which its conduct is assailed are amply supported by the evidence.

The order is affirmed.

Ford, J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 3, 1963.